IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 04-cv-01224-PSF-CBS

UNITED STATES OF AMERICA, *ex rel.*
BOBBY MAXWELL,

     Plaintiffs,

v.

KERR-McGEE OIL & GAS CORPORATION, a Delaware corporation,

     Defendant.

---

## ORDER OF DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

---

In this *qui tam* action brought under the False Claims Act ("FCA"), 31 U.S.C. §

3729 *et seq.*, a jury trial was held from January 16, 2007 to January 23, 2007, and the

jury returned a verdict in favor of Relator Bobby Maxwell on January 23, 2007.  Prior to

the trial, this Court denied Defendants Kerr-McGee Oil & Gas Corporation and related

entities' Motion for Summary Judgment for Lack of Subject Matter Jurisdiction (Dkt. #

114), as the Court had insufficient facts to foreclose relator's pursuit of the case in this

fashion given the pretrial ambiguities.  Also, although this Court allowed an immediate

appeal of such jurisdictional issues (Dkt. # 139), the Tenth Circuit declined an

interlocutory appeal.  (Dkt. # 142, Ex. 2).

After trial, with a fuller array of facts before it, the Court deferred entry of

judgment pending the parties' submission of briefing on the contents of the judgment.

Simultaneously with that briefing, on February 1, 2007, the remaining defendant as

deemed by stipulation of the parties, Kerr-McGee Oil & Gas Corporation ("Kerr-McGee"), filed its Motion for Findings and Conclusions Regarding the Court's Subject Matter Jurisdiction, Request for Hearing, and to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. # 214), which is the subject of this Order.  Relator filed his response in opposition on February 19, 2007 (Dkt. # 221), and Kerr-McGee replied on February 26, 2007 (Dkt. # 227).  This Court held a hearing on the motion and on the contents of the judgment on Thursday, March 1, 2007.  No judgment on the jury's verdict has been entered.  Having considered the evidence presented at trial and the submissions and arguments of counsel, the Court now enters the following Order.

## I.    BACKGROUND

Kerr-McGee explored for and produced oil pursuant to leases with the federal government, and is obligated to pay royalties based on specified terms to the federal government under those leases.  Relevant to this litigation are 57 federal leases under which Kerr-McGee produced oil offshore in the Gulf of Mexico.  Relator Bobby Maxwell was employed as a senior auditor with the Minerals Management Service ("MMS"), which is part of the United States Department of the Interior and which oversees and collects Kerr-McGee's royalty payments on its federal leases.  Part of Maxwell's job as an MMS auditor was "to try to determine whether or not the value that the royalty payor is reporting and upon which the royalty is based is in fact correct . . . and not fraudulent."  Maxwell Dep. at 19, attached as Ex. I to Def.'s Br. Supp. M. to Dismiss;

*see also id.* at 17 (part of an MMS auditor's job is "[t]o look for any signs or indications of fraud").[1]

In 2001-02, the MMS conducted an audit of Kerr-McGee's federal royalty reporting, which Maxwell designed and in which he directly participated. *See* Tr. Trans. at 98; *see also* Maxwell Supp. Aff. ¶¶ 7-9, attached as Ex. 5 to Rel.'s Opp. At the time of the audit, Maxwell had four to eight supervisors working under him. Maxwell Dep. at 40. Several MMS auditors were stationed at Kerr-McGee during the audit, although Maxwell himself was not. *Id.* at 198-99; Tr. Trans. at 502-03. However, Maxwell was frequently on site at Kerr-McGee and took documents back to his office to review "whenever possible." Maxwell Supp. Aff. ¶ 7. Kerr-McGee was required to comply with document requests from the MMS during the audit. Maxwell Dep. at 185-86, 196; Tr. Trans. at 504.

On November 15, 2002, the MMS sent an audit issue letter to Kerr-McGee that contained a preliminary determination based on the audit that Kerr-McGee had underpaid royalties on crude oil Kerr-McGee produced from certain federal offshore leases and sold to a company called Texon, L.P. ("Texon"). Tr. Ex. 76. According to the letter, this conclusion was primarily based on Kerr-McGee's allegedly accepting less than market price for the oil from Texon in exchange for Texon's assuming part of Kerr-McGee's marketing responsibilities. *Id.* at 1. Maxwell signed the letter on behalf of the MMS. *Id.* at 5. Kerr-McGee submitted a written response to the MMS disputing

---

[1] Maxwell's deposition testimony was admitted at trial, which contradicted his trial testimony that MMS auditors do not have a duty to look for fraud. Tr. Trans. at 235-36.

3

the letter's claims and findings.  Tr. Ex. 323.  After receiving the response, Maxwell

concluded that the MMS should issue to Kerr-McGee an order for payment of additional

royalties and prepared draft orders to that effect, which he circulated to his senior

manager, John Russo.  Maxwell Aff. ¶¶ 9-11, attached as Ex. K to Def.'s Br. Supp. M. to

Dismiss; Tr. Trans. at 151-52.  However, those orders were never issued.  Tr. Trans. at

154.

Sometime in 2003, Maxwell "and others [at MMS] . . . began to consider whether

Kerr-McGee's actions amounted to fraud."  Maxwell Supp. Aff. ¶ 14.  Both Maxwell and

his manager, John Russo, concluded that Kerr-McGee had engaged in fraud.  *Id.*;

Maxwell Dep. at 157-60.  This conclusion was not based on any additional documents

or information other than that collected during the audit.  Maxwell Supp. Aff. ¶ 14.

Maxwell decided to proceed with the underlying litigation as a *qui tam* relator "once [he]

accepted the fact that the federal government would not pursue Kerr-McGee" for

violating the applicable federal oil and gas regulations.  *Id.* ¶ 17.  The MMS issued a

Final Audit Report in December 2004, after Maxwell had filed this action and which

Maxwell was not involved in preparing.  Tr. Ex. 119; Tr. Trans. at 169, 245-46.  The

Report stated that the MMS had left open the issue of whether Kerr-McGee had

engaged in fraud.  Tr. Ex. 119; Tr. Trans. at 169-70.

Maxwell filed the instant *qui tam* action under the FCA on June 14, 2004 (Dkt. #

1), while he was still employed by the MMS.  In his Amended Complaint (Dkt. # 9),

Maxwell averred that Kerr-McGee:

> fail[ed] to properly market or otherwise obtain the fair market value for oil produced from federal lands, including offshore Gulf of Mexico, and fail[ed] to increase the royalty value of said oil to reflect either the value of the marketing services provided by others, or to reflect the fair market value which the Defendants should have received if they had properly discharged their duty to market this oil for the benefit of the United States or if they had otherwise not engaged in misconduct or sold this oil pursuant to arms-length contracts.

Am. Compl. ¶ 1.  Specifically, Maxwell alleged that Kerr-McGee and other related entities had an arrangement with Texon whereby Kerr-McGee agreed to sell substantially all of its available federal crude oil to Texon for significantly less than its fair market value, in consideration for Texon's agreeing to pay more for other non-federal oil and to perform certain marketing-related services for Kerr-McGee.  Maxwell contended that Kerr-McGee reported the sales value of the oil for royalty purposes and paid the royalties accordingly, without "grossing up" the actual sales proceeds to reflect the fair market value of the oil and the value of the marketing services provided by Texon.  *See e.g. id.* ¶¶ 42-48.  As a result, Maxwell alleged, Kerr-McGee knowingly made false and/or fraudulent statements on the monthly royalty reports submitted to the MMS and "understated and underpaid" its federal royalties.  *Id.* ¶¶ 49-50.

Before filing suit, Maxwell, through his attorneys, sent a letter to the United States Attorney on June 2, 2004.  Ex. 15 to Rel.'s Opp.  The letter was characterized as Maxwell's "voluntary prefiling disclosures of his proposed *qui tam* action" against Kerr-McGee.  *Id.* at MAXWELL 0091.  The summary of the claim in the letter's disclosure statement contained similar information and conclusions to those in the prior audit

issue letter sent by the MMS and the subsequently filed Complaint:  that Kerr-McGee

sold federal oil to Texon for significantly less than its fair market value in exchange for

Texon's incurring marketing expenses; that Kerr-McGee had concluded the Texon

arrangement was more profitable than selling the oil for its fair market value and

incurring its own marketing expenses; and that Kerr-McGee failed to "gross up" the

sales price on which the royalty value was based to reflect either the oil's fair market

value or the value of Texon's marketing services.  *Id.* at MAXWELL 0093.

## II.      THE TRIAL

A jury trial was held on Maxwell's claims, and the jury found that Kerr-McGee,

which at that point as indicated above was the only remaining defendant pursuant to

stipulation of the parties, knowingly made or used a false record or statement in order

to conceal, avoid, or decrease an obligation to pay money to the United States

Government in violation of the FCA.  Verdict Form (Dkt. # 198) at 1.  The jury awarded

damages of $7,555,886.28, representing the amount that the government was not paid

as a result of Kerr-McGee's submission of false records.  *Id.* at 2.  As noted above, this

Court deferred consideration of judgment to allow the parties to brief several issues

pertaining to the contents of the judgment.  Simultaneously with the briefing on those

issues, Kerr-McGee filed the motion to dismiss that is the subject of this Order.

## III.     THE RETURN TO PRELIMINARY ISSUES

Before allowing the jury's verdict to enter as a judgment, the initial jurisdictional

issues must be revisited in light of the subsequent evidence and the information

obtained at trial and in post-trial motions and arguments.  On December 2, 2005, Kerr-

McGee filed a Motion for Summary Judgment for Lack of Subject Matter Jurisdiction (Dkt. # 58).  Concluding at that point that there was a sufficient basis to hold that it had subject matter jurisdiction over this action, this Court denied the motion on June 9, 2006 (Dkt. # 114).  However, with the benefit of the evidence developed at trial, along with the arguments presented by Kerr-McGee in the instant motion and the hearing thereon, the Court concludes that a reevaluation of its prior holding that it has subject matter jurisdiction over this case is appropriate.  F.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

In reconsidering whether it has subject matter jurisdiction, or in other words whether Maxwell is a permissible relator under these circumstances, the Court emphasizes that the jury's verdict regarding Kerr-McGee's ultimate liability and the amount the government was allegedly shortchanged are not at issue in this Order.

## IV.    ANALYSIS

### A.    Applicable Legal Standards

The burden to show jurisdiction is on the party claiming it.  *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999).  Federal courts being courts of limited jurisdiction, jurisdiction is presumed not to exist absent a showing by the party seeking to invoke federal jurisdiction.  *Id.* (citing *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 551 (10th Cir. 1992), *cert. denied*, 507 U.S. 951 (1993)).  Further, statutes conferring such jurisdiction are to be strictly construed.  *United States ex rel. Fine v. MK-Ferguson*, 99 F.3d 1538, 1543-

7

44 (10th Cir. 1996).  Maxwell thus bears the burden of presenting facts and evidence sufficient to support jurisdiction as set out in the FCA.

The FCA sets out the jurisdictional prerequisites for maintaining a suit under the statute, providing:

> (A)  No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B)  For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4).  The Tenth Circuit has held that a four-step inquiry is necessary in order for a federal court to evaluate its jurisdiction over an FCA suit under the above provision.  *Hafter*, 190 F.3d at 1161.  First, was there a disclosure of the allegations or transactions at issue from one of the listed sources in the statute?  *Id.* Second, was the alleged disclosure made "public" within the meaning of the FCA?  *Id.* Third, was the relator's complaint "based upon" this public disclosure?  *Id.*  If any one of these inquires is answered in the negative, jurisdiction is satisfied and the suit may proceed without analysis of the fourth step.  *See id.*  However, if all three questions are answered affirmatively, the analysis proceeds to the fourth step, and the suit is barred unless the relator qualifies as an "original source."  *Id.*

Kerr-McGee sets forth two primary arguments in its motion to dismiss on jurisdictional grounds. First, Kerr-McGee argues that Maxwell cannot satisfy the FCA's specific jurisdictional prerequisites because Maxwell's FCA claim is based on public disclosures within the meaning of the FCA and because Maxwell cannot qualify as an original source. *See generally* Def.'s Mot. at 11-24. Second, Kerr-McGee argues that Maxwell cannot serve as a relator in an FCA action that is based on a government audit that he supervised. *Id.* at 28-32.

### B.     Is Maxwell Barred from Acting as a Relator Under the FCA?

Before addressing whether Maxwell has satisfied the FCA's jurisdictional prerequisites, the Court will first consider whether Maxwell is categorically barred from serving as a relator in an FCA action that stems from the results of a government audit supervised by Maxwell. The Court considered this issue in its first Order addressing subject matter jurisdiction, holding that Maxwell was not barred from qualifying as a relator. *See* Order Denying Def.'s MSJ at 5-7. The Court stands by its prior holding on this issue, the analysis of which is reproduced below with limited revisions.

The Tenth Circuit's *en banc* opinion in *United States ex rel. Holmes v. Consumer Insurance Group*, 318 F.3d 1199 (10th Cir. 2003), indicates that Maxwell is not barred from acting as a relator under the FCA. *Holmes* specifically rejected the notion that the FCA bars certain people—*i.e.*, government employees—from inclusion in its term "person" when describing who may bring a *qui tam* action. *See* 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government."). Although the Court in *Holmes* did not address the specific situation of a government auditor, as opposed to a government employee

9

working in another job capacity, the Court specifically contemplated that the plaintiff was obligated as part of her job duties to report fraud and procedural irregularities, noting, "[t]he fact that an employee learns of fraud in the course of his or her employment and has a duty to report fraud does not bar the government employee's FCA action." *Holmes*, 318 F.3d at 1204.  The opinion does not appear to turn on the fact that the relator in that case, a postmaster, did not have as her primary job duty the investigation of fraud as Maxwell did, contrary to the distinction attempted to be drawn by defendant.

The Tenth Circuit also expressly recognized in *Holmes* that, while public policy concerns may support a different outcome, "nothing in the FCA expressly precludes federal employees from filing *qui tam* suits." *Id.* at 1212.  This would also include any bar against government auditors such as Maxwell.  *Holmes* concluded that "[a]lthough there may be sound public policy reasons for limiting government employees' ability to file *qui tam* actions, that is Congress' prerogative, not ours." *Id.* at 1214.

Thus, under the controlling Tenth Circuit *en banc* decision of *Holmes*, Kerr-McGee's argument that Maxwell cannot serve as a relator in a *qui tam* suit is without merit.  A government employee who obtains information about fraud in the scope of his or her employment and who is required to report that fraud is a "person" for FCA purposes under 31 U.S.C. § 3730(b)(1) and is not barred from serving as a relator for public policy reasons. *Id.*  Again, *Holmes* gives no indication that the distinction asserted by Kerr-McGee between Maxwell and the *Holmes* relator is legally relevant.

Further, the conflict-of-interest issue discussed in *Holmes* does not bar Maxwell from potentially serving as a viable relator in this case.  *Holmes* noted the possibility

10

that federal conflict-of-interest laws might be implicated by a government employee filing a *qui tam* action based upon information obtained in the course of his or her employment.  In particular, it was mentioned that "such an employee might have to forfeit all or part of the recovery obtained." *Holmes*, 318 F.3d at 1214 n.11.  However, because the issue was not raised by the government, which intervened in that case, or briefed by the parties, the court found it "unnecessary to resolve the issue." *Id*.  Here, not only has the government chosen not to intervene, but any conflict of interest by Maxwell that may affect his recovery comes only between the government and Maxwell. Such an alleged conflict does not affect his status as a "person" under the FCA, nor does it deprive this Court of jurisdiction.  Although this Court recognizes that a government auditor acting as a *qui tam* relator for personal gain based upon knowledge obtained through his government duties may be undesirable as a matter of policy, such a dual role is not foreclosed under the language of the FCA or Tenth Circuit precedent. Possible reformation of the existing statutory scheme based on policy considerations is a legislative issue, not one for the courts.

As Maxwell is not categorically barred from serving as a relator in this case, the Court thus now turns to whether he has satisfied the specific jurisdictional prerequisites set out in the FCA.

### C.    Public Disclosure Analysis

Under § 3730(e)(4)(A), "[n]o court shall have jurisdiction over [a *qui tam*] action . . . based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media,

11

unless the action is brought by . . . an original source of the information."  There are three steps in an FCA public disclosure analysis: (1) whether the disclosure of the allegations or transactions at issue was from one of the listed sources in the statute; (2) whether the disclosure constituted a "public disclosure" within the meaning of the FCA; and (3) whether the relator's complaint was "based upon" this public disclosure. *Hafter*, 190 F.3d at 1161.  A court should address these three public disclosure issues first and should only consider the fourth, "original source" issue if the court answers the first three questions in the affirmative.   *Id.* (citations omitted).

Kerr-McGee contends a public disclosure occurred in this case based on an e-mail exchange between David Darouse, an employee of the State of Louisiana, and Roman Geissel, an MMS agent, in early April 2003.  Darouse sent the initial e-mail in the context of an audit that was being conducted by the Louisiana Department of Natural Resources of Kerr-McGee's royalty payments to the State of Louisiana under Kerr-McGee's contracts with Texon.  Darouse dep. at 35-36, attached as Ex. C to Def.'s Br. Supp. M. to Dismiss.  In an April 1, 2003 e-mail to Geissel, Darouse requested a copy of the Kerr-McGee/Texon contract for the period from August 1995 through December 2001 and stated that "[w]e analyzed the prices being paid by Texon to Kerr and found them to be FAR below gravity adjusted market indices."  Darouse E-mail, attached as Ex. H. to Def.'s Br. Supp. M. to Dismiss (emphasis in original).  Geissel's e-mail in reply, dated April 2, 2003, noted that "[w]e have done a lot of work at Kerr and found numerous problems which will result in a significant underpayment."  *Id.*

With regard to the first step of the public disclosure analysis, Maxwell argues in a single sentence, citing no relevant authority, that the e-mail did not qualify as a "listed

source" under the FCA.  Such an assertion is insufficient to raise an issue under the first step of the analysis to this Court.  *See Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1209-10 (10th Cir. 2006) (conclusory assertions that are undeveloped by argument and citations to evidence and authority are waived by inadequate briefing). In addition, Maxwell does not argue that his FCA claim was not "based upon" the disclosure in question under the third step of the analysis and has thus waived any such argument.  Moreover, the Tenth Circuit has held that the term "based upon" as used in 31 U.S.C. § 3730(e)(4)(A) means "supported by."  *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1044 (10th Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005) (citations omitted) ("A relator need not have learned of the basis for the *qui tam* action from the public disclosure for its action to be considered based upon that public disclosure if the allegations are substantially similar.").  The Court finds, and Maxwell does not argue otherwise, that Maxwell's claims are "supported by" and thus "based upon" the e-mail from Darouse to Geissel under the FCA.  Accordingly, the only legitimately disputed issue with respect to the public disclosure analysis is the second step; that is, whether the e-mail constitutes a public disclosure.

According to the Tenth Circuit, a "public disclosure occurs when the allegations or fraudulent transactions upon which the *qui tam* suit is based are affirmatively disclosed to members of the public who are otherwise strangers to the fraud."  *MK-Ferguson*, 99 F.3d at 1545.  In *MK-Ferguson*, the Tenth Circuit held that an audit report prepared by the United States Department of Energy ("DOE") and sent to the State of Oregon regarding a project that both the DOE and the State had audited, without any restrictions on its dissemination, qualified as a public disclosure.  *Id.*  The Court found

that "Oregon was not a party to the questioned contracts and projects.  Oregon was thus a stranger to the fraud like any other member of the public."  *Id.*

Defendant argues that the same scenario exists here:  An MMS auditor (Geissel) disclosed information to Louisiana (Darouse) "clearly indicating the direction and findings of its audit."  Def.'s Br. Supp. M. to Dismiss at 13.  According to Kerr-McGee, Louisiana was not a party to the questioned contracts, and both Darouse and the State of Louisiana were strangers to the fraud.  *Id.*  Citing *Holmes* and *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514 (10th Cir. 1996), Maxwell contends that the e-mail exchange was not a public disclosure because Darouse had independently determined, before his contact with the MMS, that Kerr-McGee's contracts with Texon were for below the oil's fair market value and that Kerr-McGee had underpaid its state royalties.  Rel.'s Opp. at 15-16 (citing *Ramseyer*, 90 F.3d at 1521 ("public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided to others not previously informed thereof"), and *Holmes*, 318 F.3d at 1205 (same)).  Thus, according to Maxwell, Geissel could not have revealed any alleged wrongdoing of Kerr-McGee to Darouse that Darouse did not already know through his own investigation.  *See* Darouse Aff. ¶ 7, attached as Ex. 4 to Rel.'s Opp. (characterizing the Geissel e-mail as "insignificant" and noting that "Mr. Geissel did not tell us anything we did not already know").

Maxwell also argues that Darouse had an obligation to keep the e-mail confidential, and that the e-mail was in fact maintained by the State of Louisiana in a confidential audit file that was not available to the public before October 2004.  *Id.* ¶¶ 8-10.  Finally, Maxwell contends that Darouse and his department were federal agents

and were considered part of the MMS.  *See* Darouse Dep. at 17-19, attached as Ex. 3 to Rel.'s Opp. (explaining that as a Louisiana state auditor, Darouse also sometimes by contract conducts audits of federal leases for the MMS at its direction and the state is reimbursed for his salary by the MMS).  Communications from one federal agent to another do not constitute a public disclosure.  *See Ramseyer*, 90 F.3d at 1521 n.4 (citation omitted).

The Court finds that *MK-Ferguson* is controlling and that the e-mail from Geissel to Darouse constitutes a public disclosure under the FCA.  *MK-Ferguson* involved a prime contractor's claims for additional construction costs under a contract it had with the DOE.  99 F.3d at 1541.  The State of Oregon, which was not a party to the contract, conducted three audits on the construction site at issue and sent an audit report to the DOE.  *Id.*  As a result, the DOE commenced its own investigation, an audit was conducted, and the Office of the Inspector General sent its final audit report to both Oregon and MK-Ferguson officials.  *Id.* at 1542.  The Tenth Circuit held that this constituted an "affirmative disclosure constituting public disclosure within the meaning of the False Claims Act," noting that "Oregon was not a party to the questioned contracts and projects" and "was thus a stranger to the fraud like any other member of the public."  *Id.* at 1545.  Similarly, in this case the State of Louisiana was not a party to the federal leases at issue and was thus a stranger to the fraud with respect to those leases, regardless of whether similar allegations may have arisen with respect to Kerr-McGee's leases with Louisiana.

The distinction between the lack of any limitation on Oregon's power to release the report in *MK-Ferguson* and the "significant limitations [that] existed upon Mr.

Darouse's ability to release this e-mail to the general public" in this case does not affect the outcome.  Rel.'s Opp. at 19-20; Darouse Aff. ¶¶ 8-9 (discussing Darouse's obligation under both state agency procedures and the agency's agreement with the MMS to maintain the e-mail's confidentiality).  The Tenth Circuit has held that "a public disclosure can occur to a single person."  *Kennard*, 363 F.3d at 1043 (citing *Holmes*, 318 F.3d at 1206 n.5).  Thus, because Darouse and the entity he represented were strangers to the fraud, affirmative disclosure to him was sufficient to constitute a public disclosure, regardless of whether he could or did disclose the e-mail to the general public.

In addition, Maxwell's reliance on *Ramseyer* and *Holmes* for the proposition that disclosure to one who has independent knowledge of the fraud is misplaced.  In *Ramseyer*, a state agency audit report was disclosed only to the perpetrator and to employees of the agency that had prepared it.  90 F.3d at 1517.  The Tenth Circuit held that neither internal, "private" disclosure of the report within the agency nor disclosure to the perpetrator is a public disclosure under the FCA.  *Id.* at 1521 n.4.  However, the issue of whether disclosure to a third party, who was not involved in the fraud but had independent knowledge of the fraud, constitutes a public disclosure was not before the Court in *Ramseyer* and was not decided.  In *Holmes*, a government agency conducted interviews of several individuals involved in the fraud, during which the government's suspicions were disclosed to those individuals.  318 F.3d at 1202.  Although the Tenth Circuit noted that a public disclosure occurs when the allegations are provided to others "not previously informed thereof," the Court's holding was simply that disclosure to the three individuals who participated in the fraudulent scheme did not constitute a

16

public disclosure. *Id.* at 1205. Thus, neither *Ramseyer* nor *Holmes* forecloses the e-mail to Darouse from qualifying as a public disclosure.

Moreover, the state agency in *MK-Ferguson* to whom the federal audit report was disclosed clearly had prior knowledge of the allegations, as the agency had conducted the initial audits on which the federal investigation was based. 99 F.3d at 1541. Despite this prior knowledge, the Tenth Circuit held that disclosure of the report to the state agency constituted a public disclosure. *Id.* at 1545. *MK-Ferguson* was decided after *Ramseyer*, and the *Holmes* Court did not purport to call into question the holding in *MK-Ferguson*. Thus, to the extent Darouse had prior knowledge of the allegations of Kerr-McGee's fraud with respect to the federal leases, it does not prevent the disclosure of those allegations to him from qualifying as a public disclosure under the FCA.

Finally, the Court rejects Maxwell's argument that the e-mail in question constituted a communication from one federal auditor to another. Regardless of whether Darouse at times audited federal leases on behalf of the MMS or whether there may have been a "dual purpose" in the communication, Darouse did not participate in the federal audit of Kerr-McGee regarding the Texon contracts and contacted Geissel in connection with an audit being conducted by the State of Louisiana on a state lease between Louisiana and Kerr-McGee. Darouse dep. at 22-23. Thus, the e-mail does not qualify as a communication between federal auditors that cannot constitute a public disclosure.

Therefore, the Court holds that this *qui tam* action is based upon a public disclosure within the meaning of the FCA. Because the e-mail from Geissel to Darouse

qualifies as a public disclosure, the Court need not address Kerr-McGee's contention
that the pleadings in certain prior litigation also constitute public disclosures on which
this suit is based.

### D.     Is Maxwell an Original Source?

As discussed above, this Court has found that there was a "public disclosure" of
the underlying allegations.  Such a "public disclosure" bars jurisdiction over this *qui tam*
action unless Maxwell qualifies as an original source.  *United States ex rel. King v.
Hillcrest Health Center, Inc.*, 264 F.3d 1271, 1279 (10th Cir. 2001).  To qualify as an
original source, Maxwell must have "direct and independent knowledge of the
information on which the allegations are based and ha[ve] voluntarily provided the
information to the Government before filing an action."  *MK-Ferguson*, 99 F.3d at 1547;
31 U.S.C. § 3730(e)(4)(B).  Kerr-McGee argues that Maxwell did not have direct and
independent knowledge because his information was "derivative of the facts uncovered
by the field auditors" and because he learned of the pertinent information as part of his
official job responsibilities.  Def.'s Br. Supp. M. to Dismiss at 22-23 (quoting *MK-
Ferguson*, 99 F.3d at 1548).  Further, Kerr-McGee contends that Maxwell could not
"voluntarily" provide the information to the government because it was his job and duty
as a federal auditor to uncover Kerr-McGee's alleged underpayment.  *Id*.

### 1.     Direct and Independent Knowledge

Under the first prong of the original source analysis, Maxwell must show that he
has direct and independent knowledge of the information on which the allegations
underlying his claims are based.  *Rockwell Int'l Corp. v. United States*, 549 U.S. ___,
___ S.Ct. ___ (March 27, 2007).  Direct and independent knowledge is knowledge that

is (1) "marked by the absence of an intervening agency," (2) "unmediated by anything but the relator's own labor," and (3) "not secondhand."  *MK-Ferguson*, 99 F.3d at 1547 (citations omitted); *Hafter*, 190 F.3d at 1162.  In *MK-Ferguson*, on which Kerr-McGee heavily relies, an audit supervisor who did not perform any of the investigative audit work did not qualify as an original source.  99 F.3d at 1547-48.  The facts key to that holding included: all of the factual information contained in the complaint came from personnel and materials of the field investigators; the relator had no contact with the government agency personnel involved in the project at issue or the defendant's employees; the relator's contribution to the final audit report was limited to writing the facts provided by the auditors in layman's language; and the relator did not discover the allegedly fraudulent practices at issue.  *Id.* at 1548.

The facts of *MK-Ferguson*, however, are distinguishable from those in the instant case, as Maxwell presented evidence that he "was directly involved in the hands-on investigation" and developed the allegations of wrongdoing that would ultimately underlie this *qui tam* action.  Rel.'s Opp. at 28.  Specifically, the evidence shows:

!       Maxwell designed the subject audit of Kerr-McGee.  Maxwell Supp. Aff. ¶ 8.

!       Maxwell was frequently on site at Kerr-McGee and took documents back to his office to review "whenever possible.  *Id.* ¶ 7.

!       The field auditors obtained documents that were specifically requested by Maxwell.  Maxwell Dep. at 201-02.

!       Maxwell personally conducted a comparison of the Texon sales price data to fair market value and to the values reported by other companies, and discovered a vast difference.  Maxwell Supp. Aff. ¶ 9.

! Maxwell discovered two internal Kerr-McGee memorandums that would later be used to show that Kerr-McGee considered the Texon arrangement to be to its economic advantage. *Id.* ¶¶ 11, 13.

Defendant does not dispute these specific assertions, but rather relies on the fact that Maxwell also had a supervisory role in the audit, that Maxwell was not stationed on site during the audit, and that various members of the audit team reviewed the Kerr-McGee documents with no set procedure for determining who would review those documents. Maxwell Dep. at 204-05.

The evidence described above shows that Maxwell played a much larger role both in participating in the audit and in actually ferreting out the alleged fraud than did the relator in *MK-Ferguson*. The Court finds that, in addition to supervising the Kerr-McGee audit, Maxwell personally participated in the audit, coordinated raw data obtained during the audit and drew conclusions from that data, and personally developed, at least in part, the allegations of wrongdoing that formed the basis of both the audit issue letter and this *qui tam* action. Thus, Maxwell was actively involved in the audit and in drawing the pertinent conclusions therefrom, unlike the relator in *MK-Ferguson*, who relied entirely on the work completed and conclusions drawn by others. Although the additional MMS field auditors who engaged in the Kerr-McGee audit along with and under the supervision of Maxwell might also qualify as original sources, Maxwell is not prevented from qualifying as well, as there is no indication that there may only be one original source in an FCA action. *See* 31 U.S.C. § 3730(e)(4)(A) (describing "*an* original source") (emphasis added).

Kerr-McGee also contends that Maxwell could not have had "independent" knowledge of the information obtained during the audit. Relying on First Circuit

20

authority, Kerr-McGee argues that "a government employee charged with investigating fraud does not have 'independent knowledge' of any information gathered in the official investigation, for purposes of the FCA."  Def.'s Br. Supp. M. to Dismiss at 23 (citing *United States ex rel. LeBlanc v. Raytheon*, 913 F.2d 17, 20 (1st Cir. 1990)).  However, the holding in *LeBlanc* regarding independent knowledge is *dicta*, as the Court had determined that there was no public disclosure and unnecessarily proceeded to the original source analysis.  *LeBlanc*, 913 F.2d at 20; *see also United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1500 n.13 (11th Cir. 1991) (criticizing the First Circuit for not ending its inquiry in *LeBlanc* after finding that no public disclosure had occurred).  In addition, the Tenth Circuit has placed no such limitation on the definition of independent knowledge.  As noted above, "direct and independent knowledge" is knowledge that is "marked by the absence of an intervening agency," "unmediated by anything but the relator's own labor," and "not secondhand."  *MK-Ferguson*, 99 F.3d at 1547 (citations omitted).  Nothing in this definition would preclude knowledge gained as a result of the performance of one's official responsibilities from qualifying as "independent knowledge."

Moreover, in *MK-Ferguson* the Tenth Circuit directly addressed the issue of whether an audit supervisor had "direct and independent knowledge" of information that had been gleaned during the course of an audit.  99 F.3d at 1547.  Although the Court held that the relator in *MK-Ferguson* did not have such knowledge, the reason, as discussed above, was that the relator's knowledge was merely "derivative of the facts uncovered by the field auditors," *i.e.*, based on the work of others.  *Id.* at 1548.  The mere fact that the *MK-Ferguson* relator was a government auditor and thus,

presumably, had a duty to investigate fraud, was irrelevant to and had no bearing on the Tenth Circuit's decision.  Accordingly, Maxwell may have independent knowledge of the information that formed the basis of his FCA complaint despite the fact that Maxwell learned of the information during the course of an investigation conducted as part of the duties of his employment.

For the foregoing reasons, the Court holds that, under 31 U.S.C. § 3730(e)(4)(B), Maxwell had "direct and independent knowledge of the information on which the [FCA] allegations are based."  The Court now turns to the second prong of the original source analysis—whether Maxwell voluntarily provided the information to the government before filing the action.

### 2.   Voluntary Provision of Information to the Government

Kerr-McGee argues that Maxwell could not have voluntarily provided any information to the government when it was also his duty to do so as part of his job. Maxwell contends that he met the voluntary disclosure requirement through the letter he sent to the United States Attorney shortly before filing suit in his role as a private person, not as a federal employee.  *See* Ex. 15 to Rel.'s Opp.

In the prior summary judgment ruling in this case on subject matter jurisdiction, this Court held that Maxwell's disclosure to the government was voluntary.  *See* Order Denying Def.'s MSJ at 13-14.  In so holding, this Court relied on *Holmes*, in which the Tenth Circuit specifically contemplated the potential dual role of a government employee, noting that "even though [the *Holmes* relator] may have been acting 'as the government,' *i.e.*, in her official capacity, when she obtained the information that now forms the basis of her qui tam complaint, it is apparent that she is acting as a 'person,'

22

*i.e.*, in her individual capacity, in filing and pursuing this qui tam action." *Holmes*, 318

F.3d at 1210.  However, this analysis in *Holmes* related not to whether the relator

voluntarily provided information to the government before filing suit, but to whether a

would-be relator is categorically precluded as a government employee from filing a *qui*

*tam* action based upon information obtained in the course of employment.  *Id.* at 1209-

10, 1214.  Because the *Holmes* Court also concluded that no public disclosure had

occurred, the Court expressly did not address whether the relator in that case was an

original source.  *Id.* at 1208.  Thus, the *Holmes* decision does not govern the voluntary

disclosure analysis, and the Court will revisit this issue.

In arguing that Maxwell did not satisfy the voluntary disclosure requirement,

Kerr-McGee relies heavily on the Ninth Circuit's decision in *United States ex rel. Fine v.*

*Chevron, U.S.A., Inc.*, 72 F.3d 740 (9th Cir. 1995) (en banc), *cert. denied*, 517 U.S.

1233 (1996).  In *Fine*, the Ninth Circuit held that the relator, a government auditor, did

not voluntarily provide the information underlying his FCA claim to the government

because "[h]e was a salaried government employee, compelled to disclose fraud by the

very terms of his employment.  He no more voluntarily provided information to the

government than we, as federal judges, voluntarily hear arguments and draft

dispositions."  *Id.* at 743-44.  At least two district courts have expressly followed *Fine*

and reached similar conclusions.  *E.g.*, *United States ex rel. Foust v. Group*

*Hospitalization & Med. Servs., Inc.*, 26 F. Supp. 2d 60, 73 (D.D.C. 1998); *Wercinski v.*

*Int'l Bus. Mach. Corp.*, 982 F. Supp. 449, 461 (S.D. Tex. 1997).

It is undisputed that Maxwell shared the information discovered during the Kerr-

McGee audit with other MMS employees; indeed, he specifically discussed with others

23

in the MMS, including his manager, whether Kerr-McGee's actions amounted to fraud. Maxwell Supp. Aff. ¶ 14; Maxwell Dep. at 157-60. In addition, the information on which Maxwell based his *qui tam* complaint is the same information he learned during the course of the audit and discussed with other MMS employees. *See* Maxwell Supp. Aff. ¶¶ 14, 17. Maxwell also does not dispute that, under the holdings of *Fine* and the district court cases following *Fine*, Maxwell's communication with others in the MMS regarding information learned during the audit would not be a "voluntary disclosure," as he had a duty as a federal auditor to uncover fraudulent royalty reporting by payors like Kerr-McGee. Maxwell Dep. at 17, 19. Rather, Maxwell contends, these cases are at odds with Tenth Circuit precedent on this issue, specifically *Holmes* and *King*. He also contends that his decision to prosecute this *qui tam* action and his submission of the letter to the United States Attorney in June 2004 occurred outside the time and space limits of his work and after the MMS declined to pursue Kerr-McGee administratively. Rel.'s Opp. at 33-34.

Maxwell's argument that Tenth Circuit precedent conflicts with the *Fine* line of cases is unpersuasive. As discussed above, *Holmes* did not address the voluntary disclosure issue; thus, there is no conflict with *Fine* on that issue. In *King*, the specific issue was whether a prefiling disclosure of information to the government that did not include the identity of the relator and the potential defendants was sufficient to satisfy the FCA's disclosure requirement. 264 F.3d at 1279-80. In holding that it was not, the Tenth Circuit elaborated on what "information" must be voluntarily provided to the government before filing a *qui tam* suit. *Id.* at 1280. Specifically, such information includes "'the information underlying or supporting the fraud allegations contained in

24

the plaintiff's *qui tam* complaint.'"  *Id.* (quoting *Hafter*, 190 F.3d at 162).  The disclosure

requirement, among other things, "giv[es] the government more time than the post-filing

period to act on the fraud allegations" and allows the government "to consider whether

there has already been public disclosure of the matters, whether the prospective relator

in fact possesses direct and independent knowledge of the matters he is disclosing,

and whether he is making disclosure on a voluntary basis."  *Id.* at 1281 (citation

omitted).  The Tenth Circuit concluded that "withhold[ing] the identities of the relator

and perpetrator deprives the government of key facts necessary in its efforts to confirm,

substantiate or evaluate the fraud allegations" and that the relator thus could not qualify

as an original source.  *Id.*

The Tenth Circuit's focus in the *King* case was on the degree of information that

must be disclosed to the government before filing a *qui tam* suit; the delineation of

when such a disclosure is "voluntary," however, was not addressed in *King*.  Because

neither *Holmes* nor *King* addressed the issue of whether a disclosure is voluntary,

either in a general sense or in the context of disclosure by a federal employee, the

Court rejects Maxwell's contention that the *Fine* line of cases "cannot be reconciled with

[Tenth C]ircuit precedent."  Moreover, this Court has found no case law, and Maxwell

has not provided any, in which a court directly addressed this issue and came to a

different conclusion than the Ninth Circuit in *Fine*.  This Court agrees with the

reasoning in *Fine* and holds that a would-be relator who was "under an employment-

related obligation to do the very acts he claims were voluntary," namely, detecting

fraudulent activity and disclosing it to the government, cannot satisfy the "voluntary

disclosure" requirement of the FCA and establish subject matter jurisdiction.  *Fine*, 72

F.3d at 744; *Foust*, 26 F. Supp. 2d at 73.  This reasoning is particularly applicable here,

where the relator learned of the specific facts at issue in the course of his work, as

became clear in this case at trial and in post-trial briefing and argument.

Maxwell contends, however, that the required prefiling "voluntary disclosure" of

information in this case occurred not when Maxwell disclosed information to other MMS

auditors in the course and scope of his employment with the MMS, which he essentially

admits would not be a "voluntary" disclosure, but rather when he sent his June 2, 2004

letter to the United States Attorney summarizing the allegations of his FCA claim, which

was filed shortly thereafter.  He argues that "the false and irreconcilable supposition of

[the *Fine* line of cases] is that the type of information which a federal employee

conveys, in the scope of employment, is equivalent to the different information which a

*qui tam* relator must provide in his prefiling disclosure."  Rel.'s Opp. at 37.  This line of

cases, Maxwell argues, "do[es] not come to grips with the principle established by *King*

that a proper *qui tam* prefiling disclosure provides specific information about the details

of the intended *qui tam* suit that a federal employee simply cannot provide in the scope

of his duties."  *Id.*

This argument, however, ignores the essential holding of the *King* case, which

defined a sufficient disclosure as one that includes "the information underlying or

supporting the fraud allegations contained in the plaintiff's *qui tam* complaint."  *King*,

264 F.3d at 1280 (citation omitted).  In this case, Maxwell first made such a disclosure

in the course and scope of his employment as a federal auditor; that is, the

"information" underlying the allegations in Maxwell's *qui tam* complaint is the exact

same information that Maxwell and his fellow MMS auditors learned during the Kerr-

McGee audit, and that Maxwell was required to and did pass on to his superiors.  Thus, Maxwell's situation mirrors that of the relator in *Fine*, whose "performance of his job responsibilities, including the provision to his superiors of the information that later formed the basis of [the underlying FCA] suits, was not voluntary within the meaning of the False Claims Act."  *Fine*, 72 F.3d at 745.  Similarly, Maxwell discovered and communicated to his superiors the information that later formed the basis of his FCA complaint in the course of performing his job responsibilities.  Even Maxwell's specific conclusion that Kerr-McGee had allegedly engaged in fraud, which was apparently shared by at least one of his superiors, was based on the same information that had been gathered and evaluated during the audit.  Maxwell Supp. Aff. ¶ 14; Maxwell dep. at 157-60.

Moreover, the fact that Maxwell later summarized and converted the same information into a letter to the United States Attorney does not alter the fact that the requisite disclosure had already been made on an involuntary basis in the course of Maxwell's employment.  That is, once involuntarily disclosed, the same information cannot subsequently be voluntarily disclosed within the meaning of the False Claims Act.

Because Maxwell did not voluntarily disclose to the government the principal information underlying his FCA complaint, he does not qualify as an original source.  Accordingly, this Court lacks subject matter jurisdiction over this case.

**V.     CONCLUSION**

While the False Claims Act of course is designed to limit potential fraud against the government, the approach it permits is fundamentally procedural.  It does not allow anyone who wishes to take on claims on behalf of the government, and it does not guarantee against government mistakes.  Rather, it merely potentially allows reconsideration by the government in certain circumstances, assisted by private sector interests.

For the reasons set forth above, Defendant's Motion for Findings and Conclusions Regarding the Court's Subject Matter Jurisdiction, Request for Hearing, and to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. # 214) is GRANTED, and the case is DISMISSED for lack of subject matter jurisdiction.

DATED: March 30, 2007.

BY THE COURT:

*s/ Phillip S. Figa*

_____

Phillip S. Figa
United States District Judge