**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 04-cv-01224-REB-CBS

UNITED STATES OF AMERICA,
ex rel. BOBBY L. MAXWELL,

      Plaintiff,

v.

KERR-MCGEE OIL & GAS CORPORATION, a Delaware corporation

      Defendant.

---

## ORDER DENYING DEFENDANT'S RENEWED MOTION
## FOR JUDGMENT AS A MATTER OF LAW

**Blackburn, J.**

The matter before me is **Defendant's Renewed Motion for Judgment as a

Matter of Law, Alternative Motion for New Trial and Motion for Remittitur** [#267][1]

filed February 17, 2009.  I deny the motion.

### I. JURISDICTION

I have subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).

### II. BACKGROUND

Defendant, an oil and natural gas producer, leases federally-owned property

offshore of Texas and Louisiana, on which it explores for and produces oil.  Pursuant to

the leases, of which there are 57, Defendant must pay royalties to the United States

---

[1] "[#53]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

government on the sale of any oil produced on the properties.[2]  Further, federal regulations require that lessees of such federal properties must prudently market and sell any produced oil for the mutual benefit of the lessee and the government.[3]

The United States Minerals Management Service ("MMS"), an arm of the Department of the Interior, administers the leases between Defendant and the government.  Part of the administration includes collecting a monthly report, known as a 2014 form report, from Defendant detailing the royalty payments due.  2014 form reports must be executed by a signatory to affirm that the statements made in the reports are accurate and complete.

In 2001, the MMS began an audit of Defendant's 2014 form reporting and royalty payment.  Relator, a senior auditor at the MMS, was assigned to the audit.  During his audit investigation, Relator observed that Defendant had been selling substantially all of its federally-sourced oil to Texon, L.P. ("Texon"), a marketing company, at a preferential rate in exchange for Texon's services marketing the oil *gratis* and for Texon to pay a premium price for non-federally-sourced oil that Defendant produced.  Relator concluded that Defendant reported the oil sales to Texon using the below-market pricing without adding in, or "grossing up," the value of the services Defendant received from Texon, thereby depriving the government of royalties owed it.  Based on generally the same principles and facts, Relator also concluded that Defendant had knowingly

---

[2]  The price of oil produced on these federal properties is variable and depends on where the oil itself is sold.  Oil may be sold offshore at the lease site, offshore at another site, onshore at the first available port site, or onshore at a market site, where customers gather to purchase oil.  The price of the oil increases incrementally at each of these locations.

[3]  Pursuant to federal regulations pertaining to oil producers leasing offshore properties, producers "must place oil in marketable condition and market the oil for the mutual benefit of the lessee and the lessor at no cost to the Federal Government."  30 C.F.R. § 206.106.

breached its duty to market oil in such a manner as to receive maximum benefit for both itself, as lessee, and the government, as lessor.  Relator argued that pursuant to the applicable regulations, because of this breach, Defendant was required to calculate oil prices and royalties based on market site pricing, the highest pricing available, which it did not do.

Accordingly, Relator drafted a letter to Defendant, describing the purported royalty underpayments.  After Defendant denied any wrongdoing, Relator drafted orders for Defendant to pay the royalties, but the MMS never issued them.  On June 14, 2004, based solely on information gathered during the audit investigation, Relator brought the instant *qui tam* suit on behalf of the government under 31 U.S.C. § 3729(a)(1)(G) (the "False Claims Act").  Relator brought a so-called a reverse false claim, in which rather than wrongly causing the government to pay money, a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  Relator contended that either due to the marketing breach or the failure to recognize the value of Texon's marketing services, Defendant knowingly made false statements on its 2014 form reports and, therefore, understated and underpaid royalties from 1999 to 2003.

Thus, squarely at issue in this case are the methods of valuation of oil and the royalties thereupon.  At this juncture, Relator argues that the measure of damages in this case should be the difference between the market site price and the price Defendant received from Texon for its oil.  This calculation is referred to the "net-back" amount.  Defendant argues that Relator is entitled to the above-described "gross-up"

3

amount, which it alleges should be measured by the cost of marketing services, or at most, to net-back amounts for the leases active after a change in the law that took place on June 1, 2000.  According to Relator, a typical lease between the government and Defendant contains language to the effect of the following:

> The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production.  The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters.  Except when the Lessor, in its discretion determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof.

**See Br in Opp'n to Mot. For Summary Judgment** [#104] filed April 25, 2006, Exhibit 2.

Federal regulations also guide valuation and, to complicate matters, were subject to significant amendments during the term of the leases at issue in the instant case. Before June 1, 2000, the regulations stated: "The value of oil which is sold pursuant to an arm's-length contract shall be the gross proceeds accruing to the lessee. . . .  The lessee shall have the burden of demonstrating that its contract is arm's-length."[4]  30 C.F.R. § 206.102 (b)(1)(i) (1998).  Further, any entity using "gross proceeds under an arm's length contract in determining value," was required to "increase those gross

---

[4]  Many regulations hinge on whether the lease contract is "arm's length" and whether that contract has been breached.  An arm's length contract is a contract or agreement between independent, unaffiliated entities that have opposing economic interests regarding that contract. 30 C.F.R. § 206.151.

proceeds to the extent that the purchaser, or any other person, provides services that the seller normally would be responsible to perform to place the oil in marketable condition or to market the oil." 30 C.F.R. § 206.106.  The regulations concerning oil valuation under arm's length contracts were largely unaffected by the 2000 amendments.  The same does not hold true for valuation under non-arm's length contracts or arm's length contracts that have been breached.  Prior to June 1, 2000, the value of oil produced under such a contract was to be:

> the reasonable value determined in accordance with the first applicable of the following paragraphs:
>
> (1) The lessee's contemporaneous posted prices or oil sales contract prices used in arm's-length transactions for purchases or sales of significant quantities of like-quality oil in the same field . . . ;
>
> (2) The arithmetic average of contemporaneous posted prices used in arm's-length transactions by persons other than the lessee for purchases or sales of significant quantities of like-quality oil in the same field . . . ;
>
> (3) The arithmetic average of other contemporaneous arm's-length contract prices for purchases or sales of significant quantities of like-quality oil in the same area or nearby areas;
>
> (4) Prices received for arm's-length spot sales [at market sites] of significant quantities of like-quality oil from the same field; [or]
>
> (5) A net-back method or any other reasonable method to determine value.

30 C.F.R. § 206.102(c) (1998).  After June 1, 2000, oil valuation under non arm's length contracts came to depend largely on the location of the oil production.  In this case, because such production was not in California, Alaska, or the Rocky Mountain Region:

> (1) Value is the average of the daily mean spot prices [at market sites] published in any MMS-approved publication:

> (i) For the market center nearest your lease for crude oil similar in quality to that of your production . . .; and
>
> (ii) During the trading month most concurrent with the production month. . . .

30 C.F.R. § 206.102(c) (2000).

After Relator filed his complaint, the United States declined to intervene into the case and Defendant moved for summary judgment, arguing that the court lacked jurisdiction to hear the case [# 58].  Defendant reasoned that because Relator collected information about the alleged royalty under-payments in his capacity as a government auditor, the information was not voluntarily provided to him and, therefore, he could not properly serve as a relator.  Defendant also argued that Relator could not qualify as an "original source" of the information underlying his claim, as required under the False Claims Act, and that his claims were based on public disclosures.[5]  The late Judge Figa, who initially presided over this case, denied the motion.  (*See* **Order on Motion for Summary Judgment for Lack of Subject Matter Jurisdiction** [# 114], filed June 21, 2006.)  Defendant filed a motion seeking to certify its intentions to pursue an interlocutory appeal of the two issues, which Judge Figa granted.  (*See* **Order on Pending Motions** [# 139], filed October 6, 2006.)  The Tenth Circuit declined to hear Defendant's appeal.  This case then was tried to a jury from January 16-23, 2007.

At the close of the Relator's case-in-chief, Defendant moved both orally and in writing to dismiss Relator's claims as a matter of law pursuant to **Fed. R. Civ. P. 50(a)**

---

[5]  The False Claim Act states that "[n]o court shall have jurisdiction over [a *qui tam*] action . . . based upon the public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by . . . an original source of the information."  31 U.S.C. § 3730(e)(4)(A).

[#195].  Defendant argued that Relator could not establish that Defendant: (1) had a specific legal obligation to the government at the time the alleged false claims were made and could not establish that Defendant had a duty to pay any more royalties to the government than it did; because the MMS did not issue orders to pay; (2) had made false statements to the government because reasonable minds could disagree as to the proper royalty pricing methods; (3) had knowingly made false statements to the government; (4) purposefully sought to avoid or decrease an obligation to the government; and (5) had made any false statements that were material.  Defendant argued also that the government's knowledge, through the MMS audit, necessarily defeated Relator's claim, that Relator was not entitled to pre-judgment interest, and that subject matter jurisdiction was lacking in this case.  Judge Figa denied the motion in open court, (*see* **Courtroom Mins.** [#196], filed January 22, 2007), and the case was presented to the jury.  The jury returned a verdict in favor of the Relator and awarded the government $7,555,886.26 in damages.[6]

Just under a fortnight after the jury returned its verdict, Defendant filed a motion asking the court to set forth written findings as to subject matter jurisdiction and, based on its belief that jurisdiction was lacking, a motion seeking to dismiss the case.  (**See Motion for Findings and Conclusions Regarding the Court's Subject Matter Jurisdiction, Request for Hearing, and to Dismiss for Lack of Subject Matter Jurisdiction** [# 214], filed February 1, 2007.)  Noting that trial had clarified certain factual ambiguities, Judge Figa granted the motion.  (**See Order of Dismissal for Lack of Subject Matter Jurisdiction** [# 231], filed March 30, 2007.)  Judge Figa found that a

---

[6]  Pursuant to the terms of the False Claims Act, Relator himself is entitled to receive between 25% and 30% of the award.  **31 U.S.C. § 3730(d)(2).**

confidential e-mail exchange between an employee of the State of Louisiana to an MMS auditor detailing the aforementioned below-market pricing Defendant was offering Texon was a public disclosure of the information underlying the case, meaning that the court would only have jurisdiction over the case if Relator was found to be an original source of the information.[7]   Judge Figa then found that Relator disclosed to the government the information underlying the allegations in his complaint in his capacity as an MMS auditor and as a part of his job a federal employee.   That is to say, Judge Figa found that Relator did not disclose the information voluntarily and, therefore, found that Relator was not an original source of the information.   Accordingly, Judge Figa dismissed the case for lack of subject matter jurisdiction.

Relator appealed Judge Figa's decision.   The Tenth Circuit found that the confidential email from the Louisiana State employee to the MMS agent was not a public disclosure of the information underlying the case and, therefore, did not strip the court of subject matter jurisdiction.   Accordingly, the appellate court reversed Judge Figa's dismissal and remanded the case.   (*See* **Opinion and Judgment** [# 263], filed September 10, 2008.)   After Judge Figa's death, this case was re-assigned – first to two senior judges on this bench, and then to me [#281].

In its motion now before me, Defendant renews its motion for judgment as a matter of law, as provided by **Fed. R. Civ. P. 50(b)**.   As alternatives, Defendant brings a motion for a new trial, based on the discovery of purported new evidence and on flaws in the jury instructions, and for remittitur, based on its arguments that the jury award

---

[7]   In the e-mail, the Louisiana state employee divulged that he had analyzed the prices Defendant was charging Texon and had found them to be "FAR [sic] below gravity adjusted market indices."   The MMS auditor responded that his agency had "found numerous problems which will result in a significant underpayment."

was excessive and went against the weight of the evidence.

### III.ANALYSIS

### A.      Renewed Motion for Judgment as a Matter of Law

In its motion now before me, as before, Defendant argues that: (1) Relator cannot establish that any of its employees, either alone or collectively, possessed the requisite knowledge to satisfy the False Claims Act or that Defendant's statements were false; (2) Relator cannot establish that Defendant owed a specific legal obligation to the government; (3) the government's comprehensive knowledge of the facts underlying the case defeat Relator's claim.  However, Defendant argues also that: (1) the Defendant's related business entities that were dismissed from the case are entitled to judgment as a matter of law; (2) the damages calculations are improper because they do not comport with MMS regulations; and (3) this case improperly went to trial under the False Claims Act, because whether Defendant was paying sufficient royalties was a matter to be determined by the MMS in an administrative case.

As a threshold matter, a renewed motion under **Fed. R. Civ. P. 50(b)** cannot contain grounds for relief not asserted in the original **Fed. R. Civ. P. 50(a)** motion.  ***See Anderson v. United Tel. Co***., 933 F.2d 1500, 1503 (10th Cir. 1991).  To find otherwise would be to contravene the purposes of **Fed. R. Civ. P. 50(a)**.  ***Miller v. Eby Realty Group LLC***, 396 F.3d 1105, 1115 (10th Cir. 2005).  Accordingly, I refuse to entertain Defendant's arguments concerning the dismissed parties, damages calculations, or the propriety of the handling of this case as a civil matter, because said arguments were not contained in the original motion for judgment as a matter of law.  I will discuss only those arguments previously broached concerning Defendant's knowledge, falsity, Defendant's specific legal obligation to the government, and the effect of the

government's knowledge.

A renewed motion for judgment as a matter of law post-verdict is determined under the same standards as govern resolution of a post-evidentiary motion for judgment as a matter of law under **Fed. R. Civ. P. 50(a)**.  Motions under **Fed R. Civ. P. 50(b)** "should be cautiously and sparingly granted."  *Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir. 1988) (citations omitted).  I cannot pass judgment on the credibility of witnesses or substitute my judgment for that of the jury. *See aHinds v. General Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993).  Judgment as a matter of law is appropriate "only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion." *Id.*

### 1.    Knowledge and Falsity

Defendant argues that it is entitled to judgment as a matter of law because there is no evidence that any employee had the requisite knowledge to make a "knowing" false statement.[8]  Defendant's sprawling arguments conflate the knowledge and falsity requirements, reference a report compiled by a governmental group after the close of trial, and contain allegations, *inter alia*, that employees' interpretation of certain regulations (not contracts) was reasonable, that the leases were "arm's length as a matter of law," that the jury instructions improperly defined the requisite state of mind for

---

[8]  Defendant contends that one person must know all of the information underlying the claim.  The government has submitted a brief detailing its position to the contrary.  Whether Defendant may be charged with the knowledge of all its agents and employees, also known as the doctrine of "collective knowledge," in this case is a matter far from settled.  Judge Figa instructed the jury without reference to collective knowledge.  I therefore assume that after taking argument and considering the proposed instructions, he was convinced that this case did not involve "cobbling together pieces of 'innocent' knowledge to find the requisite scienter." *United States v. Sci. Applications Int'l Corp.*, 555 F. Supp. 2d 40, 56 (D.D.C. 2008) (citations omitted).  Accordingly, I presume Judge Figa agreed that "the issue of material importance . . . [was] whether there was at least one . . . employee who knew or should have known that [the defendant] was submitting [false claims]." *Id.* (alterations in original).

liability, and that Relator's expert's damages calculation was a "bare opinion." I re-emphasize that a renewed motion for judgment of matter of law "can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the jury." **McCardle v. Haddad,** 131 F.3d 43, 51 (2d Cir. 1997). Accordingly, I limit my analysis to those arguments which Defendant brought in its initial motion for judgment as a matter of law.

Defendant previously argued and argues now that there is no evidence to support that any of its employees knowingly submitted any false information on the 2014 form reports. Within the terms of the False Claims Act, "knowing" and "knowingly" mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 30 U.S.C. § 3729(b). In this case, the jury heard testimonial evidence that the employees who were responsible for completing and submitting the 2014 form reports understood the terms of the leases and the relevant regulations, were in contact with Defendant's marketing department employees, and were aware that Texon was providing marketing services, and did not amend the oil valuation or royalty pricing to reflect the services provided. Defendant repeatedly underscores that the jury also heard evidence that the employees believed that they were making the correct calculations and argues that the employees' beliefs were reasonable and sincere. However, I am not free to adjudge the credibility of witnesses or to substitute my judgment for that of the jury. **See Hinds**, 988 F.2d at 1045. From the evidence presented, a reasonable jury could conclude that the employees who filled out the 2014 form reports submitted false information, and either actually knew or should have known that the information was false. In the context of this inquiry, whether

there was sufficient evidence to support the Relator's market breach theory is irrelevant. Because there was sufficient evidence to support the conclusion that Defendant's employees knowingly submitted false information, the Defendant's motion for judgment as a matter of law based on a contention to the contrary must be denied.

As to falsity, Defendant previously argued and argues now that its employees did not make false statements because they did not intentionally lie, but perhaps reasonably misconstrued contracts resulting in miscalculations or misstatements.  This argument seems to arise out of Defendant's position that a successful False Claims Act claim requires "evidence of wrongful scienter."  The False Claims Act "requires no proof of specific intent to defraud."  30 U.S.C. § 3729(b).  The statute merely requires "an objective falsehood."  ***United States ex rel. Morton v. A Plus Benefits, Inc.***, 139 F. App'x 980, 982-83 (10th Cir. 2005).  I can only assume that Defendant is attempting to draw on the fact that "[e]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false" under the False Claims Act.  ***See id.***  However, in the absence of any clear opinion, scientific judgment or conclusion arising out of contract interpretation, I cannot grant Defendant's motion for judgment as matter of law based on same.

## 2.      Specific Legal Obligation

Defendant maintains also that it is entitled to judgment as a matter of law because, in the absence of an order from MMS, it had no legal obligation to pay the government and therefore cannot be subject to liability under the False Claims Act.  In essence, Defendant argues that its duty to pay royalties under the leases is not sufficient to create liability under the False Claims Act.  As Relator correctly notes, Defendant unsuccessfully argued this same point before Judge Figa at least twice – in a

motion for summary judgment, as well as in its initial motion for judgment as a matter of law.  I am no more convinced than Judge Figa was.

It is beyond dispute that liability for a reverse false claim arises if a person "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(7).  The False Claims Act does not define the term "obligation," but to bring a *qui tam* suit under the False Claims Act in the Tenth Circuit, a relator must allege that "an existing, legal obligation to pay or transmit money or property to the government" was violated.  ***Kennard v. Comstock Res., Inc.***, 363 F.3d 1039, 1048 (10th Cir. 2004), *cert. denied*, 125 S. Ct. 2957 (2005) (citations omitted).

Defendant makes much ado about the notion that such obligations must be "existing debts," and then implicitly focuses on the wrong side of "the dichotomy between 'existing debts,' which are covered by the [False Claims Act], and 'contingent penalties,' which are not."  ***United States ex rel. Bahrani v. Conagra, Inc***. 465 F.3d 1189, 1197 (10th Cir. 2006).  Contingent penalties are those that arise only after a government actor exercises its discretion.  This is perhaps why Defendant attempts to characterize its duties to the government as arising out of MMS's decision whether to issue payment orders.  However, one of the ways in which an "existing debt" may arise is through contract.  ***See id***. at 1196-97.  Thus, I find it markedly difficult to accept that Defendant's duty to pay regular royalties under a valid, contracted federal lease is not an existing legal obligation to the pay the government in the form of an "existing debt." Just as with any other lease, were Defendant not to perform its duties for the term of the contract, it would be subject to liability.  That is the very manifestation of an existing debt, rather than a contingent one, within the jurisprudence of the False Claims Act.

Accordingly, Defendant's motion for judgment as a matter of law based on the lack of legal obligation must be denied.

### 3.    Government's Comprehensive Knowledge

Defendant argues also that it is entitled to judgment as a matter of law because MMS's knowledge of Defendant's actions was so extensive that it obviates any possibility that Defendant could have the requisite state of mind to be liable under the False Claims Act.  More specifically, Defendant contends that because MMS "conducted an intensive audit" and "reviewed thousands of documents," Relator's claim must fail as a matter of law.  This one-paragraph argument is specious at best.

Defendant does not misstate the law, but woefully misapplies it to the facts of this case.  Even fleeting reference to the sole legal citation in Defendant's argument illustrates the point.  To defeat a defendant's *mens rea* as a matter of law in a case brought under the False Claims Act, the defendant and government must have been in an "ongoing dialogue" about the activities underlying the case and must have "so completely cooperated and shared all information" that a defendant could not have knowingly submitted false claims.  ***Shaw v. AAA Eng'g & Drafting, Inc.***, 213 F.3d 519, 534 (10th Cir. 2000) (citations omitted).  Defendant does not even allege that it had an ongoing or open dialogue with MMS as to its royalty payment calculations, much less point to record evidence of any such cooperation.  Given the foregoing, Defendant's motion for judgment as a matter of law based on government knowledge must be denied.

### B.    Motion for New Trial

Next, Defendant argues that if it is not entitled to judgment as a matter of law, it is entitled to a new trial based on newly-discovered evidence, erroneous jury instructions,

and insufficiency of the evidence.  When a case has been tried to a jury, a new trial may

be granted "for any of the reasons for which new trials have heretofore been granted in

actions at law in the courts of the United States."  **Fed.R. Civ. P. 59(a)(1)(A)**.  A motion

for new trial "is not regarded with favor and should only be granted with great caution."

***United States v. Kelley***, 929 F.2d 582, 586 (10th Cir. 1991).  The decision whether to

grant a new trial is committed to the sound discretion of the trial court.  ***Id.***

> In ruling on a motion for a new trial, the trial judge has broad
> discretion.  He has the obligation or duty to ensure that
> justice is done, and, when justice so requires, he has the
> authority to set aside the jury's verdict.  He may do so when
> he believes the verdict to be against the weight of the
> evidence or when prejudicial error has entered the record.

***McHargue v. Stokes Div. of Pennwalt Corp.***, 912 F.2d 394, 396 (10th Cir. 1990).

### 1.    New Evidence – the OIG Report

First, Defendant asserts that a September 19, 2007 report by the Office of the

Inspector General of the United States Department of the Interior (the "OIG") on various

*qui tam* cases, including the one at bar, warrants a new trial.[9]  Specifically, Defendant

asserts that the OIG report reveals that MMS counsel and Relator's superiors at MMS

disagreed with Relator that Defendant had miscalculated the royalties.  Defendant

contends that had this information been available at trial, the jury would not have found

that Defendant knowingly under-reported any royalties.

A new trial may be appropriate if information is revealed that: (1) is newly-

discovered since trial; (2) was unavailable at the time of trial; (3) is not merely

---

[9] Defendant apparently bases this aspect of its motion on **Fed. R. Civ. P. 59(e)**, which
provides that parties may move to alter or amend judgment within 10 days of entry of same.
Courts generally grant relief under **Fed. R. Civ. P. 59(e)** to correct manifest errors of law or to
permit consideration of newly-discovered evidence. ***Loughridge v. Chiles Power Supply Co.***,
431 F.3d 1268, 1274-75 (10th Cir.2005).

cumulative or impeaching; and (4) is material, meaning it would likely produce a different result, so as to warrant a new trial. *Graham v. Wyeth Labs, Div. of Am. Home Prods Corp.*, 906 F.2d 1399, 1416 (10th Cir. 1990). The parties dispute whether the evidence is actually newly-discovered, because to be newly-discovered, "evidence must have been in existence at the time of trial but not known to the movant." *Wolfgang v. Mid-Am. Motorsports*, 111 F.3d 1515, 1530 (10th Cir. 1997) (citation omitted). Relator argues that the OIG report – which was published several months after the trial ended – necessarily did not exist at the time of trial and, therefore, cannot be considered newly-discovered evidence. Defendant maintains that all of the information contained within the report existed at the time of trial, but was unavailable, because it was subject to attorney-client privilege. I am dubious of Defendant's allegations, given that much of the report pertains to the OIG's own investigation and review or to statements made by non-attorneys that would have been discoverable.[10] But the question whether the OIG report is indeed newly-discovered evidence ultimately is moot.

It is telling that Defendant takes no position as to whether the opinions set forth in the report are merely cumulative evidence.[11] Without argument as to this point, it is quite difficult to find that these opinions, also proffered by Defendant's experts, are anything other than cumulative. Moreover, Defendant overstates the claims and cherry-picks the opinions contained in the report. While it is true that the report sets forth several MMS officials' opinions that Defendant had made no miscalculations, the report

---

[10]  Additionally, I question whether the opinions and statements would be admissible as evidence. For the purposes of this order, I will assume, *arguendo*, that they would be.

[11]  Cumulative evidence is, of course, "[a]dditional or corroborative evidence to the same point." BLACK'S LAW DICTIONARY 455 (4th ed. 1968).

also states that other officials opined that Defendant had not upheld its duty to market and, therefore, had made miscalculations.  I cannot find that these clearly divergent opinions are so supportive of Defendant's position that they likely would produce a different result at a new trial.  Thus, I must find that the OIG report is cumulative and immaterial and insufficient to support grant of a new trial.[12]

## 2.   Jury Instructions

Defendant next argues that it is entitled to a new trial because, over its objections, Judge Figa failed to instruct the jury that: (1) oil valuation under an arm's length contract where there has been a breach of the duty to market should be based on certain regulatory benchmarks, not "fair market value;" (2) the leases in question were arm's length contracts within the meaning of the applicable regulations; and (3) MMS needed to make a determination as to whether oil pricing was appropriate.  A motion for new trial may raise errors of law arising out of jury instructions, but a new trial is warranted only when, "having given full respect to the jury's findings and viewing the entire evidence, the trial judge is left with the definite and firm conviction that a mistake has been committed."  *Hughes v. Regents of Univ. of Colo.*, 967 F.Supp. 431, 437 (D. Colo.1996) (internal citation omitted).  "Generally, courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or substantial justice has not been done."  *Id*.  Jury instructions must be viewed in their entirely, not as single instructions or parts of instructions.  *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 109, 1112 (10th Cir. 2001).  Such instructions need not be flawless.  *Garrison v. Baker*

---

[12]  Because I find that this purported new evidence is immaterial and cumulative, I find that it cannot support Defendant's motion that refusal to allow a new trial to consider said evidence would violate due process or the interests of justice.  Defendant's motion for a new trial in this regard must be denied.

*Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 964 (10th Cir. 2002).  The instructions need only be a correct statement of the law and provide the jury with an appropriate understanding of the issues and applicable standards.  *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1424 (10th Cir. 1993).

Defendant's argument as to the omitted pricing benchmarks does not obtain. The regulations themselves, as set forth above, are quite lengthy.  Judge Figa was well within reason to summarize them for the jury.  While Defendant is correct that the referenced regulations do not contain the term "fair market value," prior to 2000, they contemplated "reasonable value" and after 2000, they contemplated "average " market site prices.  Given the closeness between the meanings of "fair market value," "reasonable value," and "average market price," in this particular context, I cannot find error in the reference to the first term sufficient to warrant a new trial.  Moreover, whether the lease contracts were arm's length, whether such contracts were breached, and the resultant, varied oil valuation methods are very much at the crux of this case. Relator and Defendant have battled at length over which standards and calculations to apply throughout the tenure of this case, and certainly during trial.  Accordingly, I cannot find that failure to instruct the jury that one particular, contested method of valuation was appropriate – especially when there were no instructions as to the other methods – is an error that warrants a new trial.  Defendant's motion in this regard is denied.

Defendant's arguments that the jury should have been instructed that the lease contracts were definitively arm's length and that only MMS could find Defendant in breach similarly are unavailing.  Whether the contracts are arm's length hinges on questions of fact as to whether Texon and Defendant were non-affiliated and separately aligned.  I am not convinced that these questions were settled before trial.  Defendant

evidently disagrees, but points to no evidence in the record in support of its contention. Accordingly, I cannot find that the failure to instruct the jury that the contracts were arm's length warrants a new trial and Defendant's motion is denied on this point. Finally, Defendant's argument that only MMS could find it in breach of the leases runs contrary to the letter and the spirit of the law allowing for *qui tam* actions under the False Claims Act.  If no one other than a government entity could make determinations as to whether government contractors were violating agreements or otherwise behaving badly, then there could be so such thing as a *qui tam* action.  Accordingly, I find that the failure to instruct the jury in this regard does not sanction a new trial and deny this aspect of Defendant's motion.[13]

### 3.     Weight of the Evidence

Finally, Defendant argues that it is entitled to a new trial because the verdict is against the weight of the evidence in the case.  In a two-sentence argument in support of this contention, Defendant blanket-cites twenty pages of its arguments in its renewed motion for judgment as a matter of law that there is no evidence to support the conclusion that the Defendant's employees made false statements or acted knowingly. Defendant also rehashes its arguments that evidence is lacking to establish that it had an obligation to pay the government at all, that it made any statement or other effort to conceal, decrease, or avoid such an obligation.  Determination of a motion for a new trial on the grounds that the jury verdict is against the weight of the evidence is left to the discretion of the trial court.  ***See Escue v. Northern OK College***, 450 F.3d 1146,

---

[13]  Defendant also "continues to assert the other objections to the jury instructions and verdict form" and ostensibly bases its motion on these continued objections, despite the fact that it "does not repeat all of those objections in this Motion."  The motion for new trial is denied to the extent it is based on any additional, unspecified arguments.

1156-57 (10th Cir. 2006).  "Where a new trial motion asserts that the jury verdict is not supported by the evidence," the evidence must be considered in the light most flattering to the prevailing party, and "the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." ***Anaeme v. Diagnostek, Inc.***, 164 F.3d 1275, 1284 (10th Cir. 1999) (internal quotations and citations omitted).  In this instance, Defendant simply recycles its unavailing arguments in support of its other requests for relief in the motion now before me.  Addressing the defendant's other requests for relief, I have reviewed and analyzed the arguments, the applicable law, and the record.  Accordingly, in the interest of preventing further repetition and preserving judicial economy, I rely on my foregoing analysis.  This aspect of Defendant's motion for a new trial is denied.

### C.    Motion for Remittitur

Finally, Defendant argues that remittitur is appropriate because the jury's award was excessive and against the weight of the evidence and, accordingly, asks for remittitur of the damages and a new trial in the event that Relator does not accept the remittitur.  Defendant assumes that the jury blindly accepted Relator's calculation of damages, and asserts that: (1) if the theory underlying recovery is breach of the duty to market under the leases, said damages should reference the pre-2000 regulatory pricing benchmarks, as described above, which *might* cause them to be reduced; and (2) if the theory underlying recovery is that Defendant failed to account for the value of Texon's marketing services, said damages should be based on what it would have cost Defendant to hire a marketing team for the period of time in question.

"It is a fundamental legal principle that the determination of the quantum of damages in civil cases is a fact-finder's function.  The trier of the facts, who has the

first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages, pursuant to the court's instructions, deemed proper to fairly compensate the injured party." ***Bennett v. Longacre***, 774 F.2d 1024, 1028 (10th Cir. 1985).  Thus, in all but the most extreme and unusual circumstances, a jury's award of damages on a duly entered verdict is inviolate.  ***Blanke v. Alexander***, 152 F.3d 1224, 1236 (10th Cir. 1998).  The movant's burden is a heavy one.  ***Murphy Oil USA, Inc. v. Wood***, 438 F.3d 1008, 1021 (10th Cir. 2006).  Remittitur is appropriate only when "the jury award is so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." ***Id.*** (internal citations and quotations omitted).

Defendant's arguments that application of the benchmarks might reduce the damages in question do not satisfy the heavy burden in this case.  My conscience is not shocked and my sense of justice is not offended by damages of approximately 7.5 million dollars on leases involving payment of approximately 110 million dollars. Moreover, Defendant wholly overlooks that we are not privy to how the jury went about making its calculations.  The verdict form merely set forth a blank line for the amount of damages to be awarded, it did not proffer or inquire as to guidelines, formulas or calculations.  Without a more definitive – and more troublesome – statement of the rationale underlying the jury's award, I am loath to disturb it.  Accordingly, the Defendant's motion for remittitur must be denied.

### IV.Conclusion & Orders

For the reasons detailed above, I conclude that the defendant's motion for relief under **Fed. R. Civ. P. 50(b)**, **Fed. R. Civ. P. 59(a)(1)(A)**, and remittitur must be denied.

**THEREFORE, IT IS ORDERED** that **Defendant's Renewed Motion for Judgment as a Matter of Law, Alternative Motion for New Trial and Motion for Remittitur** [#267] filed February 17, 2009, is **DENIED**.

Dated September 30, 2009, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge